IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JOHN H. FAIR, | ) | |
| | ) | |
| Petitioner, | ) | 4:07CV3063 |
| | ) | |
| V. | ) | **MEMORANDUM** |
| | ) | **AND ORDER** |
| ROBERT HOUSTON, | ) | |
| | ) | |
| Respondent. | ) | |

Following a gunfight with a police officer, and the long prison sentence that resulted, John H. Fair (Fair) now wants out of a Nebraska prison. After carefully reviewing the record, and considering the briefs of the parties, Fair will remain behind bars. His petition for habeas corpus will be denied.

## *I. BACKGROUND*

In the District Court for Lancaster County, Nebraska, Fair was convicted by a jury of six serious crimes. (Filing No. 11-2, Attach. 1, at CM/ECF p. 2 (Opinion of the Nebraska Court of Appeals).) Those crimes were: Count I, attempted second degree murder; Count II, use of a firearm to commit a felony, to wit, attempted second degree murder; Count III, attempted first degree assault on an officer; Count IV, use of a firearm to commit a felony, to wit, attempted first degree assault on an officer; Count V, felon in possession of a deadly weapon; and Count VI, fleeing to avoid arrest. (*Id.*)

All of these crimes arose from an attempted traffic stop of Fair by a Lincoln police officer on February 20, 2002. (*Id.*) Demonstrating that shooting at a cop is serious business, Fair was sentenced to a total of 41 to 67 years in prison. (*Id.*)

Scott Helvie, the Chief Deputy Public Defender, represented Fair at trial. (Filing No. 11, Bill of Exceptions (BOE)[1], Vol. 1 at p. 1.) Helvie also represented Fair on direct appeal. (Filing No. 11-3, Attach. 2, at CM/ECF p. 1.)

The Nebraska Court of Appeals fairly described the factual background this way:

> In the early morning hours of February 20, 2002, while patrolling the west side of Lincoln, Officer Jeffrey Urkevich observed a dark-colored Cadillac traveling at a high rate of speed. Urkevich pulled out behind the northbound Cadillac onto Sun Valley Boulevard. Soon thereafter, Urkevich noticed that the vehicle had both an in-transit sticker in the back window and license plates, so he called the plate number in to the dispatcher. The Cadillac then turned west onto Charleston Street, and Urkevich activated his cruiser's overhead lights and effectuated the stop, first by calling it in to the dispatcher, and then by stopping his cruiser and approaching the stopped Cadillac. The headlights and spotlight on Urkevich's cruiser, as well as street lighting, illuminated the Cadillac. Urkevich, with his flashlight in hand, approached the Cadillac on the driver's side. Upon his approach, Urkevich observed the driver of the Cadillac to be a Hispanic male with short, dark hair who was wearing a "dark bluish, almost black, sweater or sweatshirt of some kind." Urkevich also noticed that the driver appeared very tense and faced straight ahead with both hands gripping the wheel. Urkevich stopped right behind the driver's door and bent over to ask the driver for his license and registration. At that point, the driver sped away.

---

[1] The transcripts making up the BOE are contained in a box held by the Clerk of Court. The transcripts have not uploaded to CM/ECF. Unless otherwise noted, citations to the BOE will be to the volume number of the transcript (printed on the left hand side of each volume) and the typewritten page number (printed on the upper right hand portion of each particular page).

Urkevich then ran back to his cruiser, and he called dispatch to report a pursuit, while following the Cadillac with his cruiser's overhead lights, siren, and spotlight activated. The Cadillac reached speeds of 45 to 50 m.p.h. and ran a red light at the intersection of First Street and Cornhusker Highway. The Cadillac continued north on First Street, and at the intersection of First and Adams Streets, the Cadillac hit a sign and slid up onto the grass. The driver got out of the Cadillac and ran around the front of it as Urkevich stopped his cruiser approximately 1 ½ to 2 car lengths behind the Cadillac, with the cruiser's headlights and spotlight shining on the rear of the Cadillac. Urkevich relayed to the dispatcher that the Cadillac had wrecked. Once he stopped his cruiser, Urkevich started to exit it in order to pursue the suspect on foot, at which time the suspect proceeded to the passenger side of the Cadillac and fired shots in Urkevich's direction. Urkevich was out of his cruiser when the first shot hit the ground in front of him and the second one hit his cruiser's hood and windshield. Urkevich then proceeded toward the Cadillac and returned fire to get the suspect to stop shooting. Urkevich reported to dispatch that shots had been fired. After more shots were fired by the suspect and Urkevich, Urkevich saw the suspect run south through the east end of an apartment complex and then lost sight of him. Urkevich fired a total of seven shots, and he testified that the suspect fired a total of five shots.

Urkevich then radioed dispatch, providing a description of the fleeing suspect. Exhibit 15, the recording of the calls to dispatch, provides the initial description, given by Urkevich and then by dispatch, as a Hispanic male with short hair, 5 feet 9 inches tall, weighing 200 pounds, and wearing a blue sweatshirt. Dispatch stated that the suspect was wearing a blue sweatshirt with white stripes; however, Urkevich clarified the description given by dispatch and stated that the suspect's blue running pants had stripes down the sides, but that the sweatshirt had none. Urkevich testified that the description he gave was a Hispanic male in his mid-twenties, 5 feet 8 inches or 5 feet 10 inches tall, and wearing a dark sweatshirt and blue running pants with three white stripes down the sides. Urkevich also testified that from the time the Cadillac wrecked to the time he lost sight of the suspect was approximately 1 to 1 ½ minutes.

-3-

The first officers to arrive at the scene on First and Adams Streets were Officers John Clarke and Carey Weinmaster. Urkevich provided the officers with a description of the suspect and the direction that he ran. Clarke and Weinmaster then attempted to locate the suspect using a tracking dog. Other officers began to arrive at the scene and set up a perimeter to attempt to keep the suspect contained.

Officer Todd Kocian was one of the officers assisting with the perimeter. While parked in the alley at approximately First Street and Dawes Avenue, Kocian saw an individual walking just inside the entrance of a trailer park who matched the description of that given by the dispatcher. Upon seeing the Hispanic male, whom Kocian described as wearing a black sweatshirt and dark-colored running pants with stripes down the sides, Kocian activated his spotlight and called dispatch to confirm the description. Once Kocian activated his spotlight, the suspect began running, and Kocian lost sight of him. Kocian called dispatch to advise that he had seen the suspect running eastbound. Kocian then drove into the trailer park and stopped to wait for other officers and the tracking dog to arrive to continue tracking the suspect.

Officer Robert Smith, who was also part of the perimeter, heard Kocian over the radio give the location where the suspect was last seen, which was close to where Smith was positioned. Thus, Smith drove into the trailer park to try to set up a smaller perimeter. As Smith was driving, he observed a male, who matched the description of the suspect, running toward him. Smith stopped his cruiser, exited, and began chasing the suspect, who was wearing a navy-blue or black, long-sleeved top and dark pants with white stripes down the sides. Smith yelled, "Stop, police," numerous times, but the individual continued running until he entered one of the trailers in the trailer park. In pursuit, Smith went inside the trailer, where he observed the suspect running down a hallway into a bedroom. Smith stopped in the living room of the trailer and, with his weapon drawn, shouted several times, "Lincoln Police. Come out with your hands up." Sgt. Donald Scheinost arrived within seconds and assisted Smith in securing the trailer. Fair testified during trial that he resided in the trailer at the time of the incident.

After several commands, two females finally came out from the back bedroom. The evidence revealed that one of the two females, Emily Hodge-Cecil, resided at the trailer at the same time as Fair. The other female, Amber Swartz, had arrived at the trailer with Hodge-Cecil between 1 and 1:30 a.m. on February 20, 2002. Prior to Fair's entering the residence, Hodge-Cecil, Swartz, a male named "Richard," and a male named "Victor" had all been in the trailer watching TV in the back bedroom. At some point, also before Fair arrived, Hodge-Cecil and Victor had gone to a gas station and other individuals had been coming and going from the trailer. Hodge-Cecil testified that when Fair entered the trailer, she observed him take his shoes and his shirt off in the back bedroom.

After Hodge-Cecil and Swartz came out and were taken into custody, Fair walked out and the police took him into custody too. When Fair came out of the bedroom, he was wearing blue running pants with white stripes down the sides, a white tank top, and white socks. Scheinost handcuffed Fair and searched him for weapons or contraband. In Fair's pocket, Scheinost discovered a bag that contained five rounds of ammunition, later identified as .357 caliber.

The officers then "cleared" the trailer to ensure that no other individuals were present who could be danger to the officers. Another male was taken into custody who appeared to have been sleeping in another bedroom. The residence was then secured pending the officers obtaining either consent to search or a search warrant. Hodge-Cecil asked Smith to retrieve her purse, which was in the back bedroom. Upon accompanying Hodge-Cecil to the room, Smith observed in plain view the sweatshirt and shoes Fair had removed upon entering the trailer.

Fair was then placed in the back seat of a police cruiser located at the trailer. Urkevich was brought to the cruiser, and Urkevich identified Fair as the individual whom Urkevich had attempted to stop near Charleston Street and who had shot at him. A search warrant was obtained to search Fair's residence, and the officers seized a box containing six live rounds of .357 ammunition, a plastic casing for

ammunition, and clothing. In searching the surrounding area for any evidence, the officers located a .357 revolver between two trailers on the 2700 block of North Second Street, which is approximately 2 ½ blocks southeast of First and Adams Streets. The officers also found a bullet fragment from a bullet that hit a residence located on Oliver Street, just southwest of the intersection of First and Adams Streets.

(Filing No. 11-2, Attach. 1, at CM/ECF pp. 2-4).

After considering 13 claims of error, and condensing them to 7 arguments for the sake of simplicity, the Nebraska Court of Appeals denied Fair's appeal on April 20, 2004. (*Id.* at CM/ECF pp. 4-13.) The arguments considered by the Court of Appeals were that the trial court erred (1) by denying the motions to suppress; (2) by overruling a *Batson* challenge; (3) by allowing the prosecutor to amend the charges; (4) by allowing the jury access to videotapes during deliberations; (5) by finding that the evidence was sufficient; (6) by admitting irrelevant and prejudicial evidence; and (7) by imposing an excessive sentence. (*Id.* at CM/ECF pp. 4-5.)

After the Nebraska Court of Appeals denied his direct appeal, Fair filed a petition for further review with the Nebraska Supreme Court. However, that petition was overruled on July 14, 2004, and the mandate issued on July 19, 2004. (Filing No. 11-3, Attach. 2, at CM/ECF p. 2.)

Fair then sought state post-conviction relief. On September 14, 2004, Fair filed a motion for post-conviction relief alleging that Helvie provided him with ineffective assistance of counsel during trial and on direct appeal. (Filing No. 11-15, Attach. 14, at CM/ECF pp. 8-19.) In particular, Fair alleged that Helvie was ineffective during trial because (1) Helvie failed to properly challenge an amended information filed on January 6, 2003; (2) Helvie failed to properly challenge the jury's use of video tapes; (3) Helvie failed to properly seek a "malice" instruction regarding the attempted second degree murder charge; and (4) Helvie failed to

properly assert a motion for new trial. (*Id*. at CM/ECF p. 10.) Fair also alleged that Helvie was ineffective on direct appeal because (5) Helvie failed to assign as error and argue all federal and state constitutional claims preserved at trial; and (6) Helvie failed to move to withdraw as counsel on direct appeal. (*Id.* at CM/ECF pp. 15-16.)

The state trial judge denied the motion in a 10-page written opinion. (*Id*. at CM/ECF pp. 29-38.) On October 20, 2006, the Nebraska Court of Appeals affirmed in a 17-page written opinion. (Filing No. 11-9, Attach. 8, at CM/ECF pp. 1-17.) Fair's petition for further review was denied by the Nebraska Supreme Court, and the mandate affirming denial of the post-conviction motion was issued on December 28, 2006. (Filing No. 11-10, Attach. 9, at CM/ECF p. 2.)

Fair filed his federal habeas petition on March 5, 2007. (Filing No. 1.) That petition raised 18 grounds for relief. (*Id*. at CM/ECF pp. 12-18.)

## *II. ANALYSIS*

Stipulating that Fair's petition is timely, Respondent argues that it must be dismissed because Fair's claims have been exhausted but procedurally defaulted or because Fair's claims lack merit, particularly when judged by the deferential standard of review that must be applied to them. Respondent is right.

*General Principles*

The relevant general principles applicable to this case are these:

\*      As for the standard of review, when a state court has adjudicated a habeas petitioner's claim on the merits, there is a very limited and extremely deferential standard of review both as to the facts and the law. *See* 28 U.S.C. § 2254(d). Sometimes, however, it will be difficult to determine what the state courts

did and therefore difficult to determine what standard of review is appropriate. *See, e.g.*, *Pfau v. Ault*, 409 F.3d 933, 939 (8th Cir. 2005). In those circumstances, a court may choose "to avoid entanglement" with state procedural questions, and apply a de novo standard of review. *Id.* That is particularly so where a "claim is doomed to failure whether we apply a de novo standard or follow AEDPA's mandate." *Id.*

* With regard to the deference owed to factual findings of a state court's decision on the merits, a federal court is bound by those findings unless the state court made a "decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Additionally, a federal court must presume that a factual determination made by the state court is correct, unless the petitioner "rebut[s] the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

* With regard to the deference owed to the conclusions of law set forth in a state court's decision on the merits, a federal court may not grant a writ of habeas corpus unless the state court's legal conclusion "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

* In general, a habeas petitioner must first fairly present each claim he or she wishes to litigate in federal court to the state courts. 28 U.S.C. § 2254(b)(1); *See also Anderson v. Harless*, 459 U.S. 4, 6 (1982) (A claim is properly presented when the state courts are given a " 'fair opportunity' to apply controlling legal principles to the facts bearing upon [the claim].") (quoting *Picard v. Connor*, 404 U.S. 270, 275, 277-78 (1971)).

* In Nebraska, a "fair opportunity" ordinarily means that each habeas claim must be presented to the Nebraska Court of Appeals, and then in a petition for further review to the Nebraska Supreme Court if the Nebraska Court of Appeals rules

against the petitioner. *See Akins v. Kenney*, 410 F.3d 451, 454 (8th Cir. 2005) (Nebraska law required habeas petitioner to file a petition for further review with the Nebraska Supreme Court in order to exhaust his available state court remedies after his conviction was affirmed by the Nebraska Court of Appeals; state rules indicated that such a procedure was considered the ordinary process because mandate could not issue until the 30-day period for filing such a petition had lapsed) (citing *O'Sullivan v. Boerckel*, 526 U.S. 838, 847 (1999) (requiring a petitioner to exhaust one complete round of the State's established appellate review process)); *Akins v. Kenney*, 533 F.Supp. 2d 935, 947 (D. Neb. 2008).

\*      Under Nebraska law, a "motion for postconviction relief cannot be used to secure review of issues which were or could have been litigated on direct appeal." *State v. Lotter*, 664 N.W.2d 892, 911 (Neb. 2003); *See also Akins*, 410 F.3d at 455-56 n. 1. In addition, as a general rule, Nebraska courts "will not entertain a successive motion for postconviction relief unless the motion affirmatively shows on its face that the basis relied upon for relief was not available at the time the movant filed the prior motion. The need for finality in the criminal process requires that a defendant bring all claims for relief at the first opportunity." *State v. Moore*, 718 N.W.2d 537, 542 (Neb. 2006) (death penalty case holding that constitutional challenge to statutorily mandated method of execution was procedurally barred) (internal citation omitted), *cert. denied*, 127 S. Ct. 1134 (2007).

\*      If a petitioner fails to "fairly present" his claim to the state courts, and he can no longer present the claim to the state courts because, for example, a state court rule prohibits serial litigation, then the federal court will be precluded from considering the claim unless the petitioner fits into one of two exceptions. *See, e.g., Winfield v. Roper*, 460 F.3d 1026, 1034 (8th Cir.2006), *cert. denied*, 127 S. Ct. 2256 (2007). That is, the petitioner must demonstrate "cause and prejudice" or a "miscarriage of justice" (like "actual innocence") in order to prosecute a claim when

-9-

that claim has not been, and cannot be, fully and fairly asserted in the state courts. *Id.*

\*      As for resolution of the merits of a claim in federal court, no evidentiary hearing is necessary when the claim may be resolved as a matter of law based either on undisputed facts or on the applicant's version of the facts, taken as true. *See*, *e.g.*, *Johnston v. Luebbers*, 288 F.3d 1048, 1059 (8th Cir. 2002) (district court did not abuse its discretion in denying habeas corpus petitioner's request for an evidentiary hearing on claim that his counsel was ineffective where record already contained facts necessary to resolve the claim).

\*      Even when there is a procedural question presented, a court may alternatively reach the merits where the record is adequate to do so. *See*, *e.g.*, *Winfield*, 460 F.3d at 1038 (where the record before the court, which included the original transcripts, the record of the state court's evidentiary hearing, the petitioner's habeas petition, and numerous briefs, presented adequate information upon which to base a decision on the merits of the petitioner's ineffective assistance of counsel claim, a court may alternatively consider the merits of the petitioner's claim rather than concentrating only on procedural questions); *Barrett v. Acevedo*, 169 F.3d 1155, 1162 (8th Cir. 1999) ("Although the procedural bar issue should ordinarily be resolved first, judicial economy sometimes dictates reaching the merits if the merits are easily resolvable against a petitioner while the procedural bar issues are complicated.") (en banc). Indeed, 28 U.S.C. § 2254(b)(2) provides: "An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

\*      To be eligible for habeas relief based on ineffective assistance of counsel, a petitioner must meet the two part test announced in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). He or she must first establish that counsel's representation was constitutionally deficient, which requires a showing that counsel's

performance fell below an objective standard of reasonableness. *Id.* at 687-88; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). If the claimant establishes the first element, the petitioner must then show that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. This requires proving that there is a reasonable probability that, but for counsel's ineffectiveness, the result would have been more favorable to the petitioner. *Id.* at 694-695. A reasonable probability is one "sufficient to undermine confidence in the outcome." *Wiggins*, 539 U.S. at 534. Merely showing a conceivable effect is not enough. *Winfield*, 460 F.3d at 1033.

\*     In Nebraska, if you have been allowed to present an ineffective assistance of counsel claim in a post-conviction action, you cannot file another such action by changing your assertion about how your lawyer erred. *See*, *e.g.*, *State v. Luna*, 434 N.W.2d 526, 528 (Neb. 1989) (holding that district court's order denying an evidentiary hearing and overruling prisoner's motion for post-conviction relief alleging ineffective assistance of counsel was not erroneous, where defendant had previously made a motion for post-conviction relief alleging ineffective assistance of counsel which was denied, even though allegations in new motion were grounded in different errors allegedly committed by counsel as compared with those cited in prior post-conviction relief attempt).

*Claims 1, 2 and 3–Motions to Suppress*

Fair claims that Officer Jeffrey Urkevich's identification of him at the scene and then again in the courtroom should have been suppressed because both were unreliable. He also claims that the fruits of the search of his person and trailer house should be suppressed because they violated the Fourth Amendment. The Nebraska Court of Appeals carefully examined these questions, and applied appropriate principles of constitutional law. (Filing No. 11-2, Attach. 1, at CM/ECF pp. 6-8.) Giving the required deference to the factual and legal conclusions of the Nebraska

courts, Fair is not entitled to relief on any of these claims. Moreover, the result would be the same even if I were to apply a de novo standard of review.

*Claim 4–Batson Challenge*

Fair is a Hispanic. The prosecutor struck Dr. Montoya, a psychologist, because she responded that she had technical experience with eyewitness identifications, because she kept current with the academic literature on the subject, because she doubted that she could ignore this expertise and because she was personally acquainted with several people who worked for the public defender or the prosecutor. The Nebraska Court of Appeals carefully examined Fair's claim that this exclusion violated the law on discrimination and concluded that the prosecutor's race-neutral explanation was sufficient. (Filing No. 11-2, Attach. 1, at CM/ECF pp. 8-9.)

Applying the deferential standard of review, this claim must be denied because it is apparent that the Nebraska Court of Appeals followed the applicable law as set down by the Supreme Court. *See, e.g., Batson v. Kentucky*, 476 U.S. 79, 96-97 (1986) (A defendant can establish a prima facie case of discrimination in the exercise of peremptory challenges by demonstrating (1) he is a member of a cognizable racial group, (2) the excluded juror is of the same racial group, and (3) the relevant circumstances of the voir dire support an inference of discriminatory purpose. After a prima facie case has been made out, the burden shifts to the prosecution to state a racially neutral reason for striking the juror). Again, even if I applied a de novo standard of review, the result would be the same.

*Claim 5–Amendment of Charging Document*

Count III of the charging document related to the allegation that Fair attempted to commit a first degree assault on the officer. After the jury was selected, but before they were sworn and before any evidence was presented, the judge allowed the

prosecutor to add "serious" in front of the words "bodily injury" and the judge allowed the prosecutor to strike the word "recklessly." (Filing No. 11, BOE at Vol. IV. p. 657-660.)[2] Thus, the prosecutor was required to prove that Fair "intentionally or knowingly" attempted to cause "serious" bodily injury to Officer Urkevich. Defense counsel objected to the amendment because it came late, but the judge denied the objection. However, the judge offered defense counsel a continuance if counsel claimed surprise. After consulting with Fair, counsel declined the continuance offer and agreed to proceed with trial understanding that counsel was not waiving his objection. (*Id.* at pp. 660-661.)

On direct appeal, the Nebraska Court of Appeals considered Fair's objection but denied it because counsel had failed to file a motion to quash the charging document as required by Nebraska pleading rules. (Filing No. 11-2, Attach. 1, at CM/ECF pp. 9-10.) The court ruled that only making an objection was insufficient. In the post-conviction appeal, the Nebraska Court of Appeals found, among things, that Fair had failed to show any prejudice regarding his counsel's failure to challenge the amendment through a motion to quash. (Filing No. 11-9, Attach. 8, at CM/ECF pp. 12.)

Assuming that Petitioner properly presented a federal due process argument to the Nebraska courts (*see, e.g.,* Fair's brief on direct appeal, filing no. 11-4, attach. 3, at CM/ECF. pp. 37-40), and further assuming that the Nebraska Court of Appeals failed to directly address that due process argument, I find and conclude, after de novo review, that Fair is not entitled to relief. As shown by Fair's rejection of the offer of a continuance, and his inability to present any plausible argument of prejudice to the Nebraska post-conviction courts, no one was surprised by the amendment and Fair received "fair notice" and thus due process. *See*, e.*g.*, *Franklin*

---

[2]Nebraska does not normally use grand juries, but, instead, allows the prosecutors to file such charges as the prosecutor deems appropriate.

*v. White*, 803 F.2d 416, 418 (8th Cir. 1986) (no due process violation where petitioner was charged under a capital murder theory but actually tried on a felony-murder theory; because the defendant and his counsel were aware of the actual charges, the habeas petitioner had "fair notice.").

*Claim 6–Jury Access to Videotapes*

Fair complains that the jury was given access to video tapes of the crime scene, although Fair acknowledges that the video tapes contained no audio portions. While this argument was presented to the Nebraska Court of Appeals on direct appeal, it was presented as a state law issue only. (Filing No. 11-4, Attach. 3, at CM/ECF. pp. 40-43.) State law issues are not cognizable in a federal habeas corpus action. *See*, *e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (stating that "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.")

To the extent that Fair now tries to convert this claim into a federal cause of action, it fails because the argument was never fairly presented as such to the Nebraska courts and it cannot now be presented to them. That is, the claim has been procedurally defaulted. In addition, Fair has not come close to excusing the default. In any event, the argument has no merit.

*Claim 7–Insufficient Evidence*

Fair raises a due process argument regarding the sufficiency of the evidence. This argument was carefully reviewed by the Nebraska Court of Appeals on direct appeal and found wanting. (Filing No. 11-2, Attach. 1, at CM/ECF pp. 10-11.) Applying the deferential standard of review, this claim must be denied.

Once again, even if I applied a de novo standard of review, the result would be the same. Fair was clearly guilty. The evidence was more than sufficient.

*Claims 8, 9, 10–Admission of Evidence*

These claims relate to Fair's argument that the trial court wrongly admitted certain evidence including ammunition, the .357 caliber revolver and a Lincoln Police Department policy regarding identifications. The Nebraska Court of Appeals carefully examined each of these claims and found them wanting. (Filing No. 11-2, Attach. 1, at CM/ECF pp. 11-12.) These arguments assert run-of-the-mill evidence questions which are not cognizable in federal court because Fair has failed to show that (1) such evidentiary rulings violated specific constitutional protections or (2) were so prejudicial that due process was violated. *See, e.g., Sera v. Norris*, 400 F.3d 538, 547 n.8 (8th Cir. 2005) ("We are not concerned here with whether this evidence was properly admitted by the state trial court, as we are prohibited from reviewing matters of state evidentiary law. . . . The admission of evidence at a state trial will only form the basis for federal habeas relief when the evidentiary ruling 'infringes upon a specific constitutional protection or is so prejudicial that it amounts to a denial of due process.' ") (citations omitted).

*Claim 11–Failing to Dismiss Count II or Count IV*

Count II charged use of a firearm to commit a felony, to wit, attempted second degree murder, and Count IV charged use of a firearm to commit a felony, to wit, attempted first degree assault on an officer. Essentially, Fair thought that Count II or Count IV should be dismissed because those counts taken together charged only one crime. On direct appeal, the Nebraska Court of Appeals ruled that the conviction on both of these counts during a single trial and the imposition of consecutive sentences as required under Nebraska law was proper. (Filing No. 11-2, Attach. 1, at CM/ECF p. 13.) The court determined that it was possible under Nebraska law to

-15-

commit two separate felonies against the same person during the same incident while using a firearm and it was also permissible under Nebraska law to charge and then impose consecutive punishments for both such crimes. To the extent that Fair challenges that ruling under Nebraska law, his claim must be denied because I lack the power to review questions of state law.

To the extent that this claim is intended to raise a federal double jeopardy argument, the Nebraska Court of Appeals found no such violation after applying the Supreme Court's decision in *Missouri v. Hunter*, 459 U.S. 359 (1983) (holding that there was no double jeopardy violation when a defendant was convicted of robbery in the first degree and also armed criminal action in a single trial; concluding that where a state legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the same conduct under the *Blockburger* test, a court's task of statutory construction is at an end and the prosecutor may seek, and the trial court or jury may impose, cumulative punishment under such statutes in a single trial).³ (Filing No. 11-2, Attach. 1, at CM/ECF p. 13.)

If Fair intends to assert a double jeopardy argument here, the Nebraska Court of Appeals ruling must stand because it is entitled to deference. Moreover, there is no meritorious "double jeopardy" claim even if I examine the merits.

---

³Respondent alternatively argues that Petitioner informed the Nebraska Supreme Court that he was *not* intending to raise a double-jeopardy argument when he submitted his petition for further review. (*See* Filing No. 29 at CM/ECF p. 20. (Respondent's brief).) Respondent claims that Petitioner informed the court that he asserted a statutory construction issue rather than a double jeopardy argument. As a result, Respondent goes on to argue that a procedural default has occurred because no double jeopardy claim was fairly presented to the Nebraska Supreme Court. (*Id.*) Although the argument is probably correct, I find it unnecessary to reach it.

*Claim 12–Excessive Sentences*

Fair's claim on direct appeal that his sentences were excessive was solely based on state law. (*See* Filing No. 11-4, Attach. 3, at CM/ECF pp. 53-55 (Fair's brief).) Thus, the denial of that claim by the Nebraska Court of Appeals (filing no. 11-2, attach. 1, at CM/ECF p. 12) is not subject to my review. To the extent that Fair now asserts an Eighth Amendment ("cruel and unusual" punishment) claim, that assertion is procedurally defaulted because it was not presented to the Nebraska courts, it cannot now be presented to them and Fair has not excused the default. Finally, even if I reached the merits, the sentences clearly did not violate the Eighth Amendment. *See*, *e.g.*, *Ewing v. California*, 538 U.S. 11, 29-30 (2003) (sentence of felony grand theft defendant to term of 25 years to life for theft of three golf clubs, pursuant to California's three strikes law, was not grossly disproportionate and thus did not violate Eighth Amendment's prohibition against cruel and unusual punishment).

*Claim 13–Exculpatory Evidence*

Fair argues that the state trial judge erred when he "suppressed" testimony about certain fingerprints that were found on the Cadillac two months after the crime. He now couches that argument as a violation of his due process rights under *Brady*. *See Brady v. Maryland*, 373 U.S. 83 (1963) (suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment). There are several problems with this argument.

First, the *Brady* claim was not fairly presented to the Nebraska courts, it is procedurally defaulted and Fair has not excused the default. Second, the trial judge simply sustained a foundation objection to testimony about the alleged fingerprints because (1) the fingerprints were found on the car long after it had left police custody and (2) the police officer who lifted the fingerprints admittedly had no qualifications

to testify about fingerprint identification. (Filing No. 11, BOE at Vol. IX. pp. 1517-1527.) The trial judge (and the prosecutor) did not "suppress" the supposedly exculpatory evidence. Rather, the trial judge made an ordinary evidentiary ruling. Decisions such as those are not subject to federal habeas review. Third, on the merits, there was no *Brady* or other due process violation, for among other reasons, because the foundation was clearly lacking for admission of the fingerprint evidence. Thus, there can be no showing that the evidence was material.

### *Claims 14 and 15–Counsel was Ineffective*

In the post-conviction proceedings, the Nebraska courts, and the Nebraska Court of Appeals in particular, carefully examined Fair's assertions that Helvie was ineffective. The Nebraska Court of Appeals found that Fair had failed to demonstrate that Helvie breached any professional norms or that Fair was prejudiced. (Filing No. 11-9, Attach. 8, at CM/ECF pp. 10-17.) Those rulings are entitled to deference because appropriate principles of constitutional law were fairly applied to the facts. To the extent that Fair raises new arguments about Helvie's supposed ineffectiveness (like counsel's handling of the "exculpatory" fingerprint evidence), those new arguments are procedurally defaulted and such defaults have not been excused.

### *Claim 16–Motion in Limine*

This claim is not clear. Fair provides no concrete context. That said, the claim, no matter how characterized, is procedurally defaulted and that default has not been excused.

### *Claims 17 and 18–The Nebraska Appellate Courts Erred*

These claims appear to be nothing more than a reassertion of Fair's other claims; that is, the Nebraska appellate courts should have given Fair relief for the

specific reasons set forth in his petition. If so, these claims must be denied for the reasons articulated earlier. If Fair intends something else, these claims are denied because they are unclear and Fair has not taken the opportunity in his brief to put "flesh on the bones" of his arguments. I am not a mind reader.

### III. CONCLUSION

Before a highly regarded and experienced trial judge, Fair was represented by a hard-working and extremely capable public defender. Because the well-prepared prosecutor's case against Fair was strong, it is not surprising that he was convicted. On direct appeal, and also during the post-conviction process, the Nebraska courts carefully scrutinized Fair's case. In short, justice appears to have been done. More to the point, there is plainly no basis for federal habeas corpus relief.

IT IS THEREFORE ORDERED that the petition for writ of habeas corpus (filing no. 1) is denied with prejudice. A separate judgment will be issued.

September 8, 2008                  BY THE COURT:

                                              *s/Richard G. Kopf*
                                              United States District Judge